## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RAFAEL GARCIA** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | |
| | : | |
| **CITY OF PHILADELPHIA** | : | **Civil Action No. 2:24-cv-06316** |
| **1515 Arch Street, 14th Floor** | : | |
| **Philadelphia, PA 19102-1595** | : | |
| | : | |
| **and** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **BRIDGET L. KIRN** | : | |
| **565 Wigard Avenue** | : | |
| **Philadelphia, PA 19128** | : | |
| | : | |
| **and** | : | |
| | : | |
| **PHILADELPHIA OFFICE OF THE** | : | |
| **DISTRICT ATTORNEY** | : | |
| **Three South Penn Square** | : | |
| **Philadelphia, PA 19107-3499** | : | |
| | : | |
| **and** | : | |
| | : | |
| **PHILADELPHIA POLICE DEPARTMENT** | : | |
| **400 N. Broad Street** | : | |
| **Philadelphia, PA 19130** | : | |
| | : | |
| **and** | : | |
| | : | |
| **SERGEANT JOSEPH DEL GRIPPO** | : | |
| **400 N. Broad Street** | : | |
| **Philadelphia, PA 19130** | : | |
| | : | |
| **and** | : | |
| | : | |
| **DETECTIVE GERARD BRENNAN** | : | |
| **400 N. Broad Street** | : | |
| **Philadelphia, PA 19130** | : | |
| | : | |
| **and** | : | |
| | : | |

| DETECTIVE THOMAS WILSON | : |
| 400 N. Broad Street | : |
| Philadelphia, PA 19130 | : |
| | : |
| and | : |
| | : |
| JOHN/JANE DOE(S) #1 - #10 | : |
| | : |
| Defendants. | : |

## COMPLAINT

Plaintiff Rafael Garcia ("Plaintiff" or "Mr. Garcia"), hereby files his Complaint as a result of the prosecutorial misconduct and wrongful imprisonment by the Defendants City of Philadelphia ("City"), then-Assistant District Attorney Bridget L. Kirn ("Kirn"), Philadelphia Office of the District Attorney ("DAO"), Philadelphia Police Department ("PPD"), Sergeant Joseph Del Grippo ("Sgt. Del Grippo"), Detective Gerard Brennan ("Det. Brennan") and Detective Thomas Wilson ("Det. Wilson"), of which the following is a statement:

## I.    THE PARTIES

1.    Plaintiff Rafael Garcia is an adult individual resident of Philadelphia, Pennsylvania and at all times relevant hereto, was in the Eastern District of Pennsylvania.

2.    Defendant City of Philadelphia is a municipality of the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls Defendant Philadelphia Office of the District Attorney and Defendant Philadelphia Police Department.

3.    At all times relevant hereto, Defendant Bridget L. Kirn was an Assistant District Attorney for Defendant Philadelphia Office of the District Attorney acting under color of state law.  Defendant Kirn is being sued in her individual capacity, as well as her supervisory capacity.

2

4.      Defendant Philadelphia Office of the District Attorney is, upon information and belief, a department of Defendant City of Philadelphia, and at all times relevant hereto, managed, directed, controlled and employed Defendant Kirn.

5.      Defendant Philadelphia Police Department is, upon information and belief, a department of Defendant City of Philadelphia, and at all times relevant hereto, managed, directed, controlled and employed Defendants Del Grippo, Brennan and Wilson.

6.      At all times relevant hereto, Defendant Sergeant Joseph Del Grippo was a sergeant in the Major Crimes Unit for Defendant Philadelphia Police Department acting under color of state law.  Defendant Del Grippo is being sued in his individual capacity, as well as his supervisory capacity.

7.      At all times relevant hereto, Defendant Detective Gerard Brennan was a detective in the Major Crimes Unit for Defendant Philadelphia Police Department acting under color of state law.  Defendant Brennan is being sued in his individual capacity, as well as his supervisory capacity.

8.      At all times relevant hereto, Defendant Thomas Wilson was a detective in the Major Crimes Unit for Defendant Philadelphia Police Department acting under color of state law.  Defendant Wilson is being sued in his individual capacity, as well as his supervisory capacity.

9.      Defendants John/Jane Doe(s) #1 - #10 are those individuals, unidentified, who investigated and/or prosecuted Mr. Garcia's case, all as will be set forth more fully herein.  The pseudonymous designations are being used to preserve claims against these individuals who will be named more fully if and when their identities are uncovered.

10.    At all times relevant hereto, all Defendants were acting in concert and conspiracy and their actions deprived the Plaintiff of his constitutional and statutory rights.

11.    At all times relevant hereto, all Defendants acted under color of state law.

## II.    JURISDICTION AND VENUE

12.    This action is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(3) and (4) and the aforementioned statutory provision.  Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) to adjudicate state law claims.

13.    Venue is appropriate because all of the events and circumstances giving to this cause of action occurred in the Eastern District of Pennsylvania.

## III.    FACTUAL BACKGROUND

14.    On May 23, 2006, Plaintiff was sentenced to a term of incarceration of 35 to 70 years after his conviction for 37 counts of Burglary, 37 counts of Receiving Stolen Property, one count of Criminal Conspiracy, and one count of Corrupt Organizations (a total of 76 counts).

15.    Mr. Garcia was tried by jury along with three co-defendants, all of whom were likewise found guilty: Luis DeJesus (a/k/a "Richie"), Petitioner's nephew Carlos Garcia (a/k/a "Los"), and Gene McFadden (a/k/a "Sparks").

16.    The Honorable Thomas Dempsey, now deceased, presided over all pre-trial, trial, and post-trial proceedings within the Philadelphia County Court of Common Pleas.

17.    The trial prosecutor was former Assistant District Attorney, Defendant Bridget L. Kirn, who was, upon information and belief, terminated from the District Attorney's Office in early 2018 for reasons presently unknown but very likely relevant to this case.

4

18.    At all times relevant hereto, Defendant Kirn was trained and supervised by Defendants City and/or DAO.

19.    The investigation of these crimes was conducted primarily by Defendant Kirn in conjunction with Defendant PPD, by and through its employees, including, but not limited to, Defendants Del Grippo, Brennan and Wilson.

20.    At all times relevant hereto, Defendants Del Grippo, Brennan and Wilson were trained and supervised by Defendants City and/or PPD.

21.    The critical trial witnesses for the Commonwealth, the testimony of whom resulted in Plaintiff's conviction, were all "cooperators:"

   a.   William Leinhauser (a/k/a "Joker"), a co-conspirator who pled guilty to a post office burglary and other charges, including an armed robbery committed while he enjoyed being free on "sign-own-bond" status, which was recommended by police officials in writing;

   b.   Tania Eckert, the girlfriend of Carlos Garcia and an uncharged accomplice in some of the burglaries; and

   c.   Jocelyn Garcia, the Plaintiff's sister, mother of Carlos Garcia, paramour of Luis DeJesus, and another uncharged accomplice to multiple burglaries and/or counts of receiving stolen property.

22.    On August 27, 2018, Rafael Garcia filed his second *pro se* PCRA Petition, as well as Memorandum of Points and Authorities, alleging multiple instances of egregious and previously undisclosed prosecutorial and police misconduct during the investigation of these crimes, which included, <u>inter</u> <u>alia</u>, after-discovered evidence of witness intimidation and/or extortion of Jocelyn Garcia by the police and prosecution.

23.     As part of his Petition, Mr. Garcia attached an Affidavit sworn by his sister, now named Jocelyn Garcia-Santiago, detailing the subversive and unlawful conduct utilized to secure her testimony during the investigation by Defendants, which specifically included threats to charge her with crimes and send her to prison if she did not falsely testify that Plaintiff lived at the residence and in the room where a significant number of stolen goods were found.

24.     Additionally, Plaintiff's own alleged "confession" to eight (8) of the burglaries was coerced, fabricated and written by Defendants Brennan and Wilson after approximately 16 hours of interrogation with no opportunity for Plaintiff to consult with a specific attorney, whom he requested by name.  The fabrication is obvious because the details contained in the alleged "confession" are not consistent with the actual burglaries themselves.

25.     During this interrogation, Defendants Brennan and Wilson threatened that they would arrest his wife and mother of one of his children if he did not sign the "already-composed-by-law-enforcement" confession that they had prepared.

26.     In September of 2020, Plaintiff filed an Amended PCRA Petition with the Philadelphia County Court of Common Pleas.

27.     Despite the continuing (and presumably deliberate) absence of full discovery from the Commonwealth, including all of the so-called "Brady material" referenced and discussed *infra*, Mr. Garcia's Amended Petition for PCRA Relief was filed on July 13, 2021.

28.     The Commonwealth responded via letter brief filed on October 25, 2021 by Assistant District Attorney Daniel V. Cerone, who has since left the DAO.

29.     In response to the Commonwealth's letter brief, counsel for Mr. Garcia filed a lengthy Petitioner's Rebuttal, with three exhibits, on October 17, 2022.

30.     Between that pair of pleadings, former Assistant District Attorney Cerone was replaced on the PCRA litigation by Assistant District Attorney Jennifer Andress of the Philadelphia District Attorney's Office, Law Division.

31.     Based upon a publicized change in the District Attorney's Office's policy regarding post-conviction file inspections in 2018 and Mr. Garcia's counsel's repeated but stonewalled requests for such an opportunity over the course of several years, Mr. Garcia's counsel was finally granted permission by Defendant City and Defendant DAO to review the Commonwealth's files, folders and documents relative to Plaintiff's case and his three co-defendants at trial.  Also included in this untimely disclosure were the withheld documents related to William Leinhauser, the cooperating informant and self-described heroin addict, who ultimately entered guilty pleas to burglary, forgery and knifepoint robbery, graded only as a felony second-degree.

32.     The case documents filled approximately seven (7) large storage boxes, and most were extremely, and likely strategically, very poorly organized.

33.     Mr. Garcia's counsel expended an unnecessarily extraordinary amount of time to review the file materials which appeared in large measure to have been deliberately disorganized.

34.     When a relevant document was found, Defendants City and DAO would not allow it to be copied or removed, but only scanned for additional "vetting" by Defendant DAO.

35.     By the end of this process, Mr. Garcia's counsel had scanned hundreds of pages of "additional discovery" into Defendant DAO's database for subsequent approval and delivery.

36.     The majority of these documents outrageously comprised undeniable but **as-yet-undivulged** Brady material, and documents that established the completely bogus, sham and preordained nature of the Defendants' "investigation.".

37.     Specifically, Defendants deliberately concealed and never disclosed, contrary to the actual evidence offered at trial, the following elements of Defendants' "investigation:"

    a.  following William Leinhauser's arrest for the post office burglary and forgery cases, the bail commissioner awarded him – a drug addict with a prior record and Virginia driver's license – release on "sign-own-bond" because his police "handler," Defendant Brennan, highlighted a request that Leinhauser should not be detained since he was assisting law enforcement against a big burglary ring active in Northeast Philadelphia;

    b.  William Leinhauser asked that his family to be moved out of their neighborhood and Chief Assistant District Attorney Leonard Deutchman transmitted a written request to Deputy District Attorney Hilary Connor for substantial funding to accomplish such a relocation.  Dubiously, there was no return endorsement by Deputy District Attorney Connor indicating whether those relocation funds were approved or not, and nowhere in the multiple Leinhauser trial files was there any response paperwork concerning this request.

    c.  William Leinhauser was free on the streets, due to the secret release arrangement with the Defendants at his arraignment, not only to wear the body wire he eventually did, but also to rob a female cashier named Gi Son Park, at knifepoint, inside Bambi Dry Cleaners on South Broad Street;

    d.  Defendant Kirn reduced the Park robbery down from its proper grade of felony-one on the returned bill of information to a mere felony-two, thereby slashing in half how much prison time the Defendants' key witness might face when he was later sentenced, and surreptitiously granting him a testimonial benefit which went

8

completely unexplained to Mr. Garcia's tribunal and finder-of-fact;

    e.   on January 11, 2005, William Leinhauser and his attorney signed a formal "Memorandum of Agreement" between himself and Chief ADA Deutchman for the Commonwealth prior to entering his guilty pleas before the Honorable Pamela Pryor Dembe. Within the Memorandum, Mr. Leinhauser promised to "waive his preliminary hearing in MC 0408-2678 1/1 and MC 04082679 1/1 [the post office cases] and will plead guilty to **all charges** in those two matters as well as in CP 0411-1046 1/1 [the knifepoint Park robbery]; and

    f.   paragraph 11 on the final page of the Memorandum of Agreement explicitly set forth the following: "This Agreement is complete and represents the entire understanding between [Leinhauser] and the Commonwealth. It may not be amended or supplemented except in writing signed by both parties."

38.    Hence, when William Leinhauser was later permitted by Defendant Kirn to enter his guilty plea to just a few of the charges, with the Park robbery reduced to a felony as a second-degree, they not only broke the executed Memorandum of Agreement between the parties, Mr. Leinhauser also **perjured** himself before the jury when he falsely testified on direct examination that he was not promised **anything** by the Commonwealth. This, of course, meant that Defendant Kirn and her supervisors at Defendant DAO **suborned** that perjury by not correcting this known and blatant falsity.

39.    The above items were far from the only violations discovered by Mr. Garcia's counsel when finally "permitted" to inspect the case files.

40.    In addition, it **finally** came to light – some 17 years after the Commonwealth knew about it – that the two principal prosecution witnesses had serious mental health histories –

obviously known to the Defendants as part of their investigation – which clearly call into question their competence to take the stand and/or their credibility in testifying.

41.    However, these records were never turned over to defense counsel at trial, nor were they mentioned anywhere at all within the stenographic record.

42.    After William Leinhauser pled guilty to robbery in January of 2005, his sentencing was deferred until March 8, 2005, so that the usual reports could be prepared and so that his postal cases of burglary and forgery could be consolidated for ultimate disposition by Judge Dembe under Rule 701, strategically concocted to be at some point <u>after</u> he was finished cooperating and testifying for Defendants Kirn and DAO in the Plaintiff's case.

43.    Such pre-sentence reports were indeed filed in early 2005 – over a year prior to the jury proceedings against Mr. Garcia – but they were hardly "regular" in their content.

44.    Lawrence Byrne, a licensed psychologist, submitted his Mental Health Evaluation for William Leinhauser by mid-January of 2005.

45.    Among other highlights, Dr. Byrne referenced several psychiatric hospitalizations for Leinhauser, including **17 separate suicide attempts**.

46.    Dr. Byrne also reported the following, taken from handwritten notes during the inspections:

> Axis I – "Severe Psychoactive Substance Abuse [and] Dependence on Heroin … He also suffers from Chronic Dysthmic Disorder [Persistent Depression]"
>
> Axis II – "Mixed Personality Disorder with Avoidance Traits [and i]mpulsive features associated with Substance Abuse"
>
> Axis III – "No known diagnosis"

47.     Later, on February 25, 2005, the Pre-Sentence Report for William Leinhauser's robbery case was submitted, which was based upon a prison interview conducted on January 16th of that year, and it also conclusively confirmed Leinhauser's pronounced mental health problems.

48.     That report mentions six or seven psychiatric hospitalizations, plus multiple suicide attempts – primarily by wrist-slashing or other body cuttings.

49.     Therefore, as to her critical trial witness William Leinhauser, Defendants Kirn and DAO withheld crucial impeachment evidence that they possessed and to which only they had access.

50.     Amazingly, the same appears to be true regarding Jocelyn Garcia, who also provided damning "evidence" against Mr. Garcia, obtained through a less than fully explained stipulation about her coerced testimony at his preliminary hearing.

51.     The investigative folder marked "RESTITUTION" contained one, and only one, copy of a clearly misfiled Discharge Order/Summary from Friends Hospital, a psychiatric facility located in Philadelphia.  It is obvious that the file label was designed to misdirect scrutiny from Jocelyn Garcia's problems, and it worked for over 18 years post trial.

52.     Prepared by Martin Plutzer M.D., this document indicated that Jocelyn Garcia was admitted there on February 10, 2006 (while Mr. Garcia's jury trial was in progress) and was discharged a week later on February 17th (well before Mr. Garcia's trial had ended and before the stipulation to her earlier testimony). The report noted:

Axis I – "Schizophrenia de-paranoid type"

Axis IV – "Medication noncompliance"

53.     More importantly, Dr. Plutzer's findings included that Jocelyn Garcia was "hearing voices" and suffering from "visual hallucinations;" moreover, he noted that she had "tried to jump through a window" and was "concussed."

54.     This critical and blatant impeachment evidence developed during the Defendants' investigation was not turned over to Mr. Garcia or his defense attorney.

55.     However, Jocelyn Garcia was indeed not hospitalized and therefore, if competent, available to testify in person on February 22, 2006, the date when her preliminary hearing notes were somehow, for unknown reason(s), admitted against her brother, Plaintiff Rafael Garcia, to his detriment.

56.     In addition to the misfiled discharge summary from Dr. Plutzer, counsel also found a folder labeled "DOCTOR'S REPORT." In it were six copies of a letter **faxed** to Judge Thomas Dempsey from psychiatrist Neil Schwab, also affiliated with Friends Hospital.

57.     Dated February 15, 2006 – and likewise **faxed** to "ADA Bridget Kirn" – it indicated that patient Jocelyn Garcia suffered from "chronic mental illness" and auditory hallucinations, and she had a "previous hospitalization with similar symptoms."

58.     Dr. Schwab's letter requested that Jocelyn Garcia be excused from testifying, but there is no ruling anywhere within the trial record as to Judge Dempsey's action on this request.

59.     Even more critically, this letter too was never timely divulged to the defense as impeachment material. Plaintiff vigorously denies that it ever was – it was, after all, information regarding his sister that he would surely remember. Further, it certainly appears that the letter was deep-sixed, since there remained a full set of six copies within the folder, and none had a fax confirmation page attached.

60.    No ethical prosecutor can call to the stand any person who is floridly psychotic – that is, "hearing voices," "suffering from visual hallucinations" and/or attempting suicide, without disclosing the mental health condition(s) of such witness to the sitting judge, the defense attorney(s) at bar and the empaneled jury. Doing so constitutes a direct affront against truth, due process, and justice under law.

61.    Consequently, when Mr. Garcia's PCRA counsel found these four documents on June 15, 2022, and sent an e-mail to Assistant District Attorney Andress requesting an immediate, in-office conference, since the documents could only be scanned rather than copied. Andress later replied that she was out of office that afternoon, June 15th.

62.    One week later, on June 22, 2022, Mr. Garcia's PCRA counsel transmitted another, much lengthier, e-mail to Assistant District Attorney Andress, which set forth the most salient discoveries during the file inspections, including the mental health issues pertaining to William Leinhauser and Jocelyn Garcia that were known to Defendants during their investigation.

63.    Additionally, that writing set forth language from the United States Justice Manual, which recommends that prosecutors promptly disclose **all** "Benefits provided to witnesses" including:

- Dropped or reduced charges

- Immunity …

- Expectations of downward departures or motions for reduction of sentence

- Assistance in a state or local criminal proceeding

- Monetary benefits

- Non-prosecution agreements …

13

● Letters to other law enforcement officials … setting forth the extent of a witness's assistance or making substantive recommendations on the witness's behalf

● Relocation assistance …

● Known but uncharged criminal conduct (that may provide an incentive to curry favor with a prosecutor) …

● **Known substance abuse or mental health issues** or other issues that could affect the witness's ability to perceive and recall events [emphasis added].

64. The Commonwealth replied on June 28, 2022, that Mr. Garcia's request for the scanned documents was "in the queue for processing," and that the mental health documents might comprise "confidential information" such that additional steps would be necessary before such material could be conveyed.

65. On July 7, 2022, Plaintiff's PCRA counsel wrote another e-mail **re-requesting** all the scanned documents, and reminding the Commonwealth of the next hearing date, October 20, 2022.

66. This July 7, 2022, letter also addressed was the privacy/confidentiality/privilege concerns interposed by the District Attorney's Office at this late date:

> [Petitioner's] response to such an assertion would be that even if those documents should not get 'automatically' turned over to defense counsel, the trial prosecutor Bridget Kirn (a) certainly knew that they existed; (b) knew that the [four] defense attorneys did not have access to them; (c) knew full well how damaging they would [and] could be as impeachment evidence against [two] of her most critical witnesses for the Commonwealth; and (d) knew – or doubtless **should** have known – how they undeniably constituted Brady/Giglio/Bagley material. Yet, apparently, she kept those cards fully face-down, as if this weeks-long jury trial were some poker game she just had to win …

67.     On July 28, 2022, Assistant District Attorney Andress responded by writing that the documents unrelated to mental health had been approved for disclosure and transmission to Mr. Garcia's counsel, but bogusly asserted that a court order would be required before the District Attorney's Office could turn over the mental health materials pertaining to William Leinhauser and Jocelyn Garcia.

68.     On August 2, 2022, Mr. Garcia's PCRA counsel acknowledged the July 28th correspondence and asked once again that the file inspection discovery be expedited and sent, "as quickly as you can."

69.     That same date, Assistant District Attorney Andress notified her support staff to send present counsel "the requested discovery …, minus the three [sic] mental health documents."

70.     Three weeks later, "the requested discovery" was still in limbo, and PCRA counsel wrote yet again to Assistant D.A. Andress on August 23rd. That message included the following questions:

> [Why is] Leinhauser's M.H. Evaluation for sentencing [deemed] "privileged," as it was *not* prepared by any psychiatrist or care provider for him[?] Plus, such documents are routinely cited, even quoted verbatim, at sentencing hearings, with court staff [and]/or complete strangers in the courtroom. Since no "protections" are ever mentioned or afforded then, why or how can they be raised by someone other than Leinhauser now?

71.     Finally, after more than ten weeks had elapsed, Mr. Garcia's PCRA counsel received the scanned documents via an e-mail link on August 26, 2022. Receipt was duly acknowledged on August 29th.

72.     Assistant District Attorney Andress followed up the very next day, advising Mr. Garcia's PCRA counsel that the Commonwealth "**will not oppose the granting of an order**

[emphasis supplied]. We just need to have that court order to send copies of those [mental health] documents."

73.     On September 21, 2022, to procure the mental health paperwork at issue, Mr. Garcia's PCRA counsel filed a Motion to Compel Disclosure of Mental Health Records for Prosecution Witnesses, which was ultimately granted, and the documents were finally produced.

74.     According to 204 Pa.Code Rule 3.8 (Special Responsibilities of a Prosecutor):

> The prosecutor in a criminal case shall: . . . (d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal.

The comment to this Rule reads:

> (1) A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence. Precisely how far the prosecutor is required to go in this direction is a matter of debate and varies in different jurisdictions. Many jurisdictions have adopted the ABA Standards of Criminal Justice Relating to Prosecution Function, which in turn are the product of prolonged and careful deliberation by lawyers experienced in both criminal prosecution and defense. Applicable law may require other measures by the prosecutor and knowing disregard of those obligations or a systematic abuse of prosecutorial discretion could constitute a violation of Rule 8.4.

75.     Here, Plaintiff had no legitimate chance to question or challenge the competency of William Leinhauser or Jocelyn Garcia to testify against him, because the records necessary to litigate such an issue were intentionally suppressed by Defendants Kirn, DAO and City, despite being well known to them beginning with their investigation.

76.    Moreover, Plaintiff and his court-appointed trial attorney were deprived of a valid and weighty means to attack the testimonial credibility of those two key witnesses, for the same reason: unlawful and intentional suppression of usable impeachment evidence by Defendants Kirn, DAO and City.

77.    "The Brady Rule" – named after Brady v. Maryland, 373 U.S. 83 (1963) – requires prosecutors to disclose to the defense any and all materially exculpatory evidence in their possession. So-called "Brady material" (that is, the evidence a prosecutor must disclose under this rule) includes any evidence favorable to the accused, any evidence that would go toward negating a defendant's guilt or reduce a defendant's potential sentence, **or evidence going to the credibility of a witness**.

78.    Further, in cases subsequent to Brady, the Supreme Court has eliminated the requirement for the accused to have made a request for such favorable information, stating that **the prosecution has a constitutional duty to disclose, which is triggered by the potential impact of favorable but undisclosed evidence**. See Kyles v. Whitley, 514 U.S. 419, 434 (1995) and United States v. Bagley, 473 U.S. 667 (1985).

79.    In both Bagley and Kyles, the Supreme Court further defined the materiality standard, outlining four aspects of materiality. First, the "reasonable probability" of a different result is **not** a question of whether the defendant would, more likely than not, have received a different verdict with the evidence, but whether the prosecution's evidentiary suppression undermines confidence in the outcome of the trial. The second aspect is that it is not a sufficiency of evidence test, and the defendant only has to show that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Third, there is no need for a harmless error review, because a Brady

violation, **by definition, cannot be treated as harmless error**. The fourth and final aspect of materiality stressed by the <u>Kyles</u> decision is that the suppressed evidence must be considered **collectively**, not item by item, looking at the cumulative effect to determine whether a reasonable probability is reached. <u>See</u> <u>Kyles</u>, 514 U.S. at 433-438.

80.    Under Pennsylvania jurisprudence, an undisclosed but "sweetheart" guilty plea deal for the testimony of a prosecution witness, such as occurred with William Leinhauser in this case, would warrant relief, standing alone. However, as set forth above, there is much, much more than this one single issue on this hidden lopsided plea deal.

81.    In <u>Commonwealth v. Strong</u>, 761 A.2d 1167 (Pa. 2000), a death penalty case, appellant had brought a PCRA claim concerning the favorable guilty plea outcome for a witness named Alexander, an accomplice of Strong who was under homicide charges himself, because the Commonwealth had maintained an adamant "no deals" position throughout Strong's murder trial. The PCRA court below found no Brady violation, but the Supreme Court reversed, and granted Strong a new trial on due process grounds. In doing so, the Court reasoned:

> [T]he facts in this case strongly indicate that Alexander's testimony was in exchange for what he believed would be a beneficial outcome to him. That understanding was material information that appellant's jury should have been informed of when weighing Alexander's credibility. There is a reasonable probability that had this information been revealed, the outcome of [Strong's] trial would have been different.

761 A.2d at 1175.

82.    The various violations of <u>Brady</u> – plus its Pennsylvania progeny like <u>Strong</u> – which occurred during Mr. Garcia's trial represent only part of a pattern of prosecutorial misconduct which fatally infected his case, literally from start to finish.

83.    The paperwork in Defendant DAO's files shows just how planned and premeditated the misconduct by Defendants DAO, Kirn and those supervising Defendant Kirn actually was.

84.    The investigation and prosecution of Plaintiff comprised in every way, shape and form a "big deal" – the kind of special assignment which could make or break a detective and/or assistant district attorney's career in public service: dozens and dozens of unsolved break-ins, the vicious nature of the residential burglaries, theft of so many items carrying enormous sentimental value, the fact that police homes were also "hit" by the ring, involvement of federal authorities like the Postal Inspection Service, the possibility of federal adoption for the Wissinoming Branch burglary, use of body-wire surveillance on William Leinhauser, the need for a five-page cooperation agreement in advance and hands-on supervision by the supervisor for the Economic Crimes Unit.

85.    In fact, this was such a "game-changing," must win assignment for Defendant Kirn that she typed out her opening and closing statements to the jury.

86.    Those speeches were not given from mere outline notes or index cards, the norm for most jury trial attorneys.  Instead, they were read nearly verbatim – a fact discovered only due to the June 2022 file inspections.

87.    This discredits any claim of "harmless error" due to some inadvertently untrue remark during "oratorical flair," as the Commonwealth dismissively may claim.

88.    For example, Defendant Kirn promised the jury that she would prove how Plaintiff was an admitted expert in residential wiring but later failed to do so by any competent evidence.  That lie was pre-recorded.

89.     More importantly, Defendant Kirn's most harmful misconduct occurred during summation.

90.     In her desperate zeal to link Plaintiff to a storage room at a property on Edmund Street that contained stolen items more than the actual evidence did, she told the jury in closing that a suitcase with his name on it was found by police there.

91.     That remark occurred **after** all of the evidence had been produced, so it could have been "fact-checked" against her trial notes or with the police subpoenaed for trial. Yet it surely was not, or else it was an abject prevarication.

92.     In either event, the false statement was "scripted," and it was both **undeniably wrong** and **undeniably prejudicial** to Plaintiff.

93.     In normal usage, the phrase "prosecutorial misconduct" remains singular, as it should be. In a better world of seeking truth and dispensing justice, perhaps one instance of misconduct per jury trial conducted would be the maximum. However, when there are as many acts of misconduct as took place during Plaintiff's proceedings, then relief must follow, and it did.

94.     On March 12, 2024, the Honorable Ramy I. Djerassi granted Plaintiff's PCRA Petition, vacated Plaintiff's sentence and ordered a new trial. See copies of the Court's Orders, attached hereto as Exhibit "A."

95.     Solely to avoid facing a new trial and spending another two years in prison awaiting a retrial above nearly 20 years Plaintiff already spent in jail, Plaintiff pled guilty to some charges of Burglary, Receiving Stolen Property and Criminal Conspiracy and was released with time served.  All of the many remaining charges were *nolle prossed*. Id.

96.    Plaintiff's plea to these charges was not based on any of the evidence he now challenged in this § 1983 claim.

97.    Plaintiff's claims do not depend on his ultimate guilt or innocence.

98.    Defendants clearly deprived Plaintiff of his Fourteenth Amendment rights when they failed to tell his trial counsel about the psychiatric hospitalizations of two "key" Commonwealth witnesses.

99.    The stenographic record for William Leinhauser's testimony and the stipulation for Jocelyn Garcia reveal that there was **no** cross-examination by any lawyer about mental health issues whatsoever.

100.    It is clear that Defendant Kirn suppressed such evidence, known to her beginning with all phases of case investigation, so that a pair of key prosecution witnesses would get to the jury "squeaky clean" of their pronounced mental health issues.

101.    Under Brady, *supra*, and its progeny, Defendant Kirn was ethically required, **at the very least**, to submit those mental health records to Judge Dempsey *in camera* for his Honor's private review and ruling. However, she did not.

102.    By withholding such crucial exculpatory evidence from the trial court, Mr. Garcia, his three co-defendants and the jury, Defendants Kirn, DAO and the City committed grievous misconduct during trial.

103.    Additionally, since Judge Dempsey never had a chance to rule on such evidence, Plaintiff was deprived of a critical issue both for his primary appeal(s) and subsequent PCRA litigation.

104.    The undisclosed immunity granted to witnesses Tania Eckert, who was arrested but released, and Jocelyn Garcia, who was not charged because she testified against Plaintiff,

comprises further misconduct in the investigation and prosecution of Plaintiff by all Defendants.

105.    All immunity in Pennsylvania is governed and authorized by statute, and limited to use immunity.

106.    As a public policy matter, appropriate court orders are required to grant immunity.

107.    Investigators freed Tania Eckert, despite the probable cause to charge her as an accomplice and possessor of the stolen property found throughout her automobile.

108.    Defendants allowed Jocelyn Garcia to walk away from her crimes and her pivotal role as the warehouser for this burglary enterprise.

109.    The jury never received the cautionary instructions about their testimony which were required to ensure fairness to Plaintiff and his co-defendants.

110.    As a result, Plaintiff served 19 years and seven months in prison for crimes he had no reasonable chance of defending and/or winning because of all of the above misconduct.

111.    For many years dating back at least to the 1970s and continuing well beyond the time of the investigation of the burglaries for which Plaintiff was wrongfully convicted, the City of Philadelphia had in force and effect a policy, practice or custom of unconstitutional misconduct in criminal investigations, and in particular, using coercive techniques in interviews and interrogations to obtain incriminating evidence; fabricating inculpatory evidence; concealing or withholding exculpatory evidence; tampering or manufacturing evidence; and fabricating incriminating statements from witnesses, suspects and arrestees.

112.    This policy, practice or custom involved the use of various techniques to coerce incriminating statements, including: isolation; separating juvenile or otherwise vulnerable suspects or witnesses from friends and family; subjecting individuals to needlessly prolonged interrogations; making false promises, including the promise that a suspect or witness will be

allowed to go home if he or she makes an inculpatory statement and/or be given favorable treatment; the use of threat of physical violence; authoritative assertions of a suspect's guilt, including confrontation with false inculpatory evidence; and providing false assurances, including to juveniles and other vulnerable people, that the suspect or witness will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

113.    These practices were well known to Defendant City of Philadelphia, Defendant PPD and Defendant DAO and its policymakers with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the Philadelphia Inquirer in 1977, governmental investigations, complaints from lawyers and civilians and internal police investigations.

114.    Additionally, Defendant Kirn has a history and pattern of prosecutorial misconduct.  In the 2016 retrial of Anthony Wright – a man originally convicted in 1993 of the rape and murder of an elderly woman (CP-51-CR-1131582-1991) –  in which Defendant Kirn served as the lead prosecutor, she stood silent while two critical police detectives gave false testimony that they had no knowledge of any exculpatory evidence when she knew this was a lie. In fact, there was exculpatory DNA evidence presented by the defense, and as a result, Mr. Wright was acquitted after serving 25 years in prison for a crime he did not commit.  This case was written about extensively in local and national media, including the Philadelphia Inquirer, Rolling Stone and Slate.

115.    At the time of the investigation and prosecution of Rafael Garcia, and for many years before and thereafter, Defendants City of Philadelphia and the Office of the District Attorney have been deliberately indifferent to the need to train, supervise and discipline its prosecutors.

116.     At the time of the investigation and prosecution of Rafael Garcia, and for many years before and thereafter, Defendants City of Philadelphia and the Philadelphia Police Department have been deliberately indifferent to the need to train, supervise and discipline its officers and detectives.

117.     At the time of the investigation and prosecution of Rafael Garcia, and for many years before and thereafter, Defendants City of Philadelphia and the Philadelphia Police Department had a policy, practice or custom of detaining, arresting and interrogating purported witnesses without legal cause and with the intent of coercing statements from these persons, under threat of punishment or other sanctions, and/or for material benefits.  These detentions and interrogations were conducted without voluntary consent and without the benefit of advice of counsel, even where the purported witness and/or his/her attorney sought the right to counsel.

118.     This practice, as exemplified by the investigations in Plaintiff's case, continued for years due to the deliberate indifference of Defendants PPD, DAO and the City to this policy, practice and custom.  Finally, in 2014, after further proof of this policy, practice and custom was provided to Defendants PPD, DAO and City, Defendant PPD issued Directive 151 (January 1, 2014), that provided legal standards for the detention and interview of witnesses and the detention and interrogation of suspects by police detectives.

119.     During the 1980's and early 1990's, and concurrent with the time of the investigation of this case by Defendants, there was within Defendant PPD a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three separate occasions in the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining Defendant PPD from engaging in these practices.  See Cliett v. City of Philadelphia, C.A. No. 85-1846 (E.D. Pa. 1985)

(consent decree arising out of "Operation Cold Turkey," that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices); Spring Garden Neighbors v. City of Philadelphia, 614 F.Supp. 1350 (E.D. Pa. 1985) (enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation); Arrington v. City of Philadelphia, C.A. No. 88-2264 (E.D. Pa. 1988) (enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

120.    Thereafter, in the late 1980's and early 1990's, a narcotics squad operating out of the 39th Police District in Philadelphia engaged in widespread unconstitutional practices, including fabrication of evidence, unlawful search and arrest warrants, concealment of evidence, false allegations of criminality, fabricating and planting evidence, coercive and physically abusive interrogations, and theft. This squad engaged in these practices for years and violated the rights of thousands of persons, due to the deliberate indifference of Defendant PPD, including the disregard of credible complaints to the Internal Affairs Division ("IAD") of Defendant PPD, and DAO, biased internal investigations, and a practice and custom of exonerating officers regardless of evidence of misconduct.

121.    This systemic and unconstitutional practice and custom was ended only upon investigation by the FBI and prosecution of the officers by the United States Attorney's Office. As a result of this pattern of police misconduct that was in effect at the time of the investigation of the crimes for which Plaintiff was charged, a Court in the Eastern District entered a Consent Decree requiring wide ranging reforms in the Philadelphia Police Department, and in particular providing for specific limitations on the investigative practices and policies of the PPD. See NAACP v. City of Philadelphia, C.A. No. 96-6045.

122.    In summary, at the time of the investigation and prosecution of Plaintiff Rafael Garcia, Defendant PPD had a practice, policy, and custom of:

    a.  Engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, using improper identification procedures, and concealing and/or failing to disclose exculpatory evidence;

    b.  Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct and/or violate generally accepted police practices;

    c.  Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

    d.  Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including unlawful police interrogations, searches, and arrests, coercion of witnesses, improper identification procedures, falsifying and fabricating evidence, and suppressing exculpatory evidence; and

    e.  Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging Philadelphia police, including the defendant officers in this case, to violate the rights of citizens

26

such as Mr. Garcia.

123.    At the time of the investigation and prosecution of Plaintiff, and for many years before and thereafter, Defendants PPD and the City of Philadelphia has been deliberately indifferent to the need to train, supervise, and discipline police officers. The IAD of Defendant PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a.  excessive and chronic delays in resolving disciplinary complaints;

b.  a lack of consistent, rational and meaningful disciplinary and remedial actions;

c.  a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d.  the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e.  the PPD discipline, as practiced, was incident-based rather than progressive; thus, repeat violators were not penalized in proportion to the number of violations;

f.  the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.  a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.  serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.  lack of an effective early warning system to identify, track, and monitor "problem" officers;

j.  IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct; interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.  IAD failed to acknowledge the disproportionate and extreme use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

## COUNT I – 42 U.S.C. § 1983
## DEPRIVATION OF LIBERTY WITHOUT DUE PROCESS OF LAW AND DENIAL OF A FAIR TRIAL UNDER THE FOURTEENTH AMENDMENT
## PLAINTIFF v. ALL INDIVIDUAL DEFENDANTS

124.  The allegations contained in the paragraphs above are incorporated herein as though fully set forth at length.

125.  Individual Defendants Kirn, Del Grippo, Brennan and Wilson, acting individually and in concert, and within the scope of their employment with Defendants City of Philadelphia and/or PPD and/or DAO, deprived Mr. Garcia of his clearly established constitutional right to due process of law and a fair trial by:

a.  fabricating, planting and/or tampering with evidence, including, but not limited to knowingly lying to the jury during closing argument that a suitcase

with Mr. Garcia's name on it was found at a location containing stolen goods and that he was renting a room at that location, when both of these assertions were blatant lies; and knowingly lying to the jury that Mr. Garcia was an "admitted expert in electrical wiring," which was also untrue;

b. Deliberately deceiving counsel and the Court by concealing and/or suppressing relevant and material evidence, including, but not limited to the mental health histories of two key witnesses;

c. Using coercion and/or threats to obtain inculpatory witness statements and Mr. Garcia's "confession;" and

d. Failing to conduct a reasonably thorough and fair investigation that considered (and disclosed) evidence negating grounds to believe that Mr. Garcia had participated in the burglaries, and ignoring evidence that exculpated Mr. Garcia.

126.    Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth and with deliberate indifference to Mr. Garcia's clearly established constitutional rights.  No reasonable prosecutor and/or police officer in 2006 would have believed this conduct was lawful.

127.    Defendants' acts and omissions, as set forth above, were the direct and proximate cause of Mr. Garcia's injuries.  Defendants knew or should have known that their conduct would result in Mr. Garcia's wrongful trial and the harms he sustained as a direct result.

WHEREFORE, Plaintiff demands judgment against Defendants Bridget L. Kirn, Sergeant Joseph Del Grippo, Detective Gerard Brennan and Detective Thomas Wilson, in an amount substantially in excess of the arbitration limits, together with punitive damages,

attorneys' fees pursuant to 42 U.S.C. § 1988, costs of this litigation, delay damages, pre- and post-judgment interest and any further relief this Honorable Court deems just and appropriate.

**COUNT II – 42 U.S.C. § 1983**
**CIVIL RIGHTS CONSPIRACY**
**PLAINTIFF v. ALL INDIVIDUAL DEFENDANTS**

128.   The allegations contained in the paragraphs above are incorporated herein as though fully set forth at length.

129.   Individual Defendants Kirn, Del Grippo, Brennan and Wilson, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals, to act in concert in order to deprive Plaintiff of his clearly established Fourteenth Amendment rights to be free from deprivation of liberty without due process of law, and to a fair trial.

130.   In furtherance of this conspiracy, Defendants engaged in and facilitated numerous overt acts, including, but not limited to, the following:

a.   fabricating, planting and/or tampering with evidence, and using coercion and/or threats to obtain incriminating witness statements;

b.   Deliberately deceiving counsel and the Court by concealing and/or withholding relevant and material evidence, fabricating evidence, tampering with evidence and using coercion and/or threats to obtain inculpatory witness statements; and

c.   Failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to believe that Mr. Garcia had participated in the burglaries, and ignoring evidence that exculpated Mr. Garcia.

131.   Defendants' acts and omissions, as set forth above, were the direct and proximate cause of Mr. Garcia's injuries.  Defendants knew or should have known that their conduct would

30

result in Mr. Garcia's wrongful trial and the harms he sustained as a direct result.

WHEREFORE, Plaintiff demands judgment against Defendants Bridget L. Kirn, Sergeant Joseph Del Grippo, Detective Gerard Brennan and Detective Thomas Wilson, in an amount substantially in excess of the arbitration limits, together with punitive damages, attorneys' fees pursuant to 42 U.S.C. § 1988, costs of this litigation, delay damages, pre- and post-judgment interest and any further relief this Honorable Court deems just and appropriate.

## COUNT III – 42 U.S.C. § 1983
## FAILURE TO INTERVENE
## PLAINTIFF v. ALL INDIVIDUAL DEFENDANTS

132.    The allegations contained in the paragraphs above are incorporated herein as though fully set forth at length.

133.    By their conduct, under color of state law and acting within the scope of their employment with Defendants City, DAO and/or PPD, the individual Defendants had opportunities to intervene on behalf of Mr. Garcia to prevent the deprivation of liberty without due process of law and to ensure his right to a fair trial, but with deliberate indifference failed to do so.

134.    The Defendants' failures to intervene violated Plaintiff's clearly established constitutional right not to be deprived of liberty without due process of law and a fair trial as guaranteed by the Fourteenth Amendment. No reasonable prosecutor and/or police officer in 2006 would have believed that failing to intervene to prevent these defendants from coercing and fabricating inculpatory evidence, using coercion and/or direct suggestion to obtain false witness statements, tampering with evidence, planting evidence, deliberately deceiving counsel and the court, failing to conduct a constitutionally adequate investigation, and causing Mr. Garcia to be subjected to an unfair trial, were lawful.

135.    Defendants' acts and omissions, as set forth above, were the direct and proximate cause of Mr. Garcia's injuries.  Defendants knew or should have known that their conduct would result in Mr. Garcia's wrongful trial and the harms he sustained as a direct result.

WHEREFORE, Plaintiff demands judgment against Defendants Bridget L. Kirn, Sergeant Joseph Del Grippo, Detective Gerard Brennan and Detective Thomas Wilson, in an amount substantially in excess of the arbitration limits, together with punitive damages, attorneys' fees pursuant to 42 U.S.C. § 1988, costs of this litigation, delay damages, pre- and post-judgment interest and any further relief this Honorable Court deems just and appropriate.

### COUNT IV – 42 U.S.C. § 1983
### SUPERVISORY LIABILITY CLAIM
### PLAINTIFF v. DEFENDANTS PHILADELPHIA POLICE DEPARTMENT, PHILADELPHIA OFFICE OF THE DISTRICT ATTORNEY, BRIDGET L. KIRN AND SERGEANT JOSEPH DEL GRIPPO

136.    The allegations contained in the paragraphs above are incorporated herein as though fully set forth at length.

137.    Defendants Kirn and Del Grippo acted recklessly and/or with deliberate indifference to Mr. Garcia's constitutional rights by failing to adequately train, supervise and discipline the attorneys, investigators, detectives, police officers and other agents assigned to this investigation, including Defendants Brennan, Wilson and Doe(s) (whose identities will be confirmed in discovery), thereby allowing and causing these attorneys, investigators, detectives, police officers and other agents to deprive Mr. Garcia of his clearly established constitutional rights, including his rights to be free from the deprivation of liberty without due process of law and to a fair trial under the Fourteenth Amendment.

138.    Defendants Kirn and Del Grippo were personally involved in the investigation and prosecution of Mr. Garcia and directly supervised the investigative acts taken by themselves

and other agents of Defendants Philadelphia Police Department and Philadelphia District Attorney's Office, who, it is anticipated by Plaintiff, will be more specifically identified during discovery.

139.    The reckless and deliberately indifferent conduct of Defendants Kirn and Del Grippo violated the clearly established duty, in 2005-2006, to supervise the agents, and no reasonable assistant district attorney and/or police sergeant in 2005-2006 would have believed that reckless and deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinates was lawful.

140.    Defendants Kirn and Del Grippo's acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Garcia's injuries.  Defendants knew or should have known that their conduct would result in Mr. Garcia being subjected to a denial of due process and an unfair trial.

WHEREFORE, Plaintiff demands judgment against Defendants Bridget L. Kirn and Joseph Del Grippo in an amount substantially in excess of the arbitration limits, together with punitive damages, attorneys' fees pursuant to 42 U.S.C. § 1988, costs of this litigation, delay damages, pre- and post-judgment interest and any further relief this Honorable Court deems just and appropriate.

### COUNT V – 42 U.S.C. § 1983
### MUNICIPAL LIABILITY CLAIM
### PLAINTIFF v. DEFENDANT CITY OF PHILADELPHIA

141.    The allegations contained in the paragraphs above are incorporated herein as though fully set forth at length.

142.    Defendant City of Philadelphia, by and through its final policymakers, had in force and effect during the time of Mr. Garcia's arrest and trial, and for many years preceding

and following the trial, a policy, practice or custom of unconstitutional conduct in burglary and other criminal investigations, that included using coercive techniques in interviews and interrogations; fabricating evidence; fabricating incriminating statements from witnesses, suspects and arrestees by coercion, threats and suggestion; tampering with evidence; planting evidence; concealing and/or withholding exculpatory evidence; and failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute.

143.    Policymakers for Defendant City of Philadelphia had actual or constructive notice of the above practices, policies and customs, but repeatedly failed to undertaken any meaningful investigation into allegations that police officers, criminal detectives, investigators and attorneys were using coercive techniques in interviews and interrogations; withholding exculpatory evidence; fabricating inculpatory evidence; tampering with evidence; planting evidence; fabricating incriminating statements from witnesses, suspects and arrestees; failing to conduct a reasonably thorough and fair investigation that considered evidence negating grounds to arrest and prosecute; and failing to take appropriate remedial and/or disciplinary actions to curb the above misconduct.

144.    Defendant City acted recklessly and/or with deliberate indifference to Mr. Garcia's constitutional rights by failing to adequately train, supervise and discipline the individual Defendants, as well as police officers, detectives, attorneys, investigators and other agents assigned to this investigation (Doe(s), whose identities will be confirmed in discovery), thereby allowing and causing these agents, including the individual Defendants, to deprive Mr. Garcia of his clearly established constitutional rights, including his rights to be free from the deprivation of liberty without due process of law and to a fair trial under the Fourteenth

34

Amendment.

145.    Defendant City did not adequately train the individual Defendants, as well as police officers, detectives, attorneys, investigators and other agents assigned to this investigation (Doe(s), whose identities will be confirmed in discovery) regarding the requirement to turn over Brady evidence, which is confirmed by the fact that this critical evidence was deliberately withheld from Mr. Garcia and his trial counsel.

146.    Furthermore, Defendant City did not adequately supervise the individual Defendants, as well as police officers, detectives, attorneys, investigators and other agents assigned to this investigation (Doe(s), whose identities will be confirmed in discovery) regarding this Brady evidence, and thus allowed the non-disclosure of this crucial impeachment evidence to Mr. Garcia and his trial counsel.

147.    The unconstitutional municipal customs, practices and/or policies described above were the moving force behind Mr. Garcia's trial and the other injuries and damages set forth in this Complaint.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount substantially in excess of the arbitration limits, together with attorneys' fees pursuant to 42 U.S.C. § 1988, costs of this litigation, delay damages, pre- and post-judgment interest and any further relief this Honorable Court deems just and appropriate.

**COUNT VI**
**DAMAGES**
**PLAINTIFF v. ALL DEFENDANTS**

148.    The allegations contained in the paragraphs above are incorporated herein as though fully set forth at length.

149.     The unlawful, intentional, willful, deliberately deceptive, reckless, deliberately indifferent and/or malicious actions and omission of all Defendants caused Mr. Garcia to be compelled to stand trial, which resulted in pain and suffering, mental anguish, emotional distress, restrictions on personal liberty, loss of freedom, deprivation of familial relationships, economic harms and other associated damages.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount substantially in excess of the arbitration limits, together with attorneys' fees pursuant to 42 U.S.C. § 1988, costs of this litigation, delay damages, pre- and post-judgment interest and any further relief this Honorable Court deems just and appropriate.

**COUNT VII**
**PUNITIVE DAMAGES**
**PLAINTIFF v. DEFENDANTS PHILADELPHIA OFFICE OF THE DISTRICT ATTORNEY, PHILADELPHIA POLICE DEPARTMENT AND ALL INDIVIDUAL DEFENDANTS**

150.     The allegations contained in the paragraphs above are incorporated herein as though fully set forth at length.

151.     These Defendants acted willfully, deliberately, maliciously and/or with reckless disregard for the Plaintiff's constitutional rights, and punitive damages should therefore be awarded against Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Philadelphia Office of the District Attorney, Philadelphia Police Department, Bridget L. Kirn, Sergeant Joseph Del Grippo, Detective Gerard Brennan and Detective Thomas Wilson in an amount substantially in excess of the arbitration limits, together with punitive damages, attorneys' fees pursuant to 42 U.S.C. § 1988, costs of this litigation, delay damages, pre- and post-judgment interest and any further relief this Honorable Court deems just and appropriate.

## NOTICE OF PRESERVATION OF EVIDENCE

PLAINTIFF HEREBY DEMANDS AND REQUESTS THAT DEFENDANTS TAKE NECESSARY ACTION TO ENSURE THE PRESERVATION OF ALL DOCUMENTS, COMMUNICATIONS, WHETHER ELECTRONIC OR OTHERWISE, ITEMS AND THINGS IN THE POSSESSION OR CONTROL OF ANY PARTY TO THIS ACTION, OR ANY ENTITY OVER WHICH ANY PARTY TO THIS ACTION HAS CONTROL, OR FROM WHOM ANY PARTY TO THIS ACTION HAS ACCESS TO, ANY DOCUMENTS, ITEMS, OR THINGS WHICH MAY IN ANY MANNER BE RELEVANT TO OR RELATE TO THE SUBJECT MATTER OF THE CAUSES OF ACTION AND/OR THE ALLEGATIONS OF THIS COMPLAINT.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

**THE BEASLEY FIRM, LLC**

BY:    _/s/ Dion G. Rassias_
DION G. RASSIAS, ESQUIRE
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000
(215) 592-8360 (facsimile)

DATED:  March 31, 2025

## <u>CERTIFICATE OF SERVICE</u>

Dion G. Rassias, Esquire, hereby certifies that on this date, a true and correct copy of the

foregoing was sent to the below-listed individuals, via ECF:

Aleena Y. Sorathia, Esquire
Katelyn L. Mays, Esquire
Ahmad Zaffarese LLC
One South Broad Street, Suite 1910
Philadelphia, PA 19107
*Attorneys for Defendant City of Philadelphia*

Shelley R. Smith, Esquire
Archer & Greiner, P.C.
Three Logan Square
1717 Arch Street, Suite 3500
Philadelphia, PA  19103
*Attorneys for Defendant Bridget L. Kirn*

**THE BEASLEY FIRM, LLC**

BY:    */s/ Dion G. Rassias*
DION G. RASSIAS, ESQUIRE
1125 Walnut Street
Philadelphia, PA 19107
(215) 592-1000
(215) 592-8360 (facsimile)

DATED:  March 31, 2025